# CACHE VALLEY BANKING CO. v. CACHE COUNTY POULTRY GROWERS ASS'N et al.

No. 7304.   Decided August 17, 1949.   (209 P. 2d 251.)

See 28 C. J. S., Easements, sec. 68. Use of private way as easement or under claim of right, see note, 98 A. L. R. 1098. See, also, 17 Am. Jur. 969.

*Preston & Harris,* Logan, for appellant.

*Irwin Clawson,* Salt Lake City, *LeRoy B. Young,* Ogden, for respondent.

WADE, Justice.

The question here posed is whether the evidence sustains the findings of the court that the defendant's and its predecessor's use of plaintiff's property as a right of way for ingress and egress to and from its property was adverse and against plaintiff and its predecessors and not permissive under them. The facts, circumstances, happenings and events surrounding this controversy are not in substantial dispute. The defendant, the Utah Poultry & Farmers Cooperative, respondent here, and its predecessors have used a part of the property now belonging to plaintiff, the Cache Valley Banking Company, executor of the will of Wilford F. Baugh and his heirs, for a period of more than 20 years in entering and leaving its property. This user has been continuous and not interrupted by plaintiff or its predecessors and the only question is whether the evidence sustains the court's findings that the use was adverse and not permissive only.

The defendant owns a tract of land 99 feet wide on the west side of Main Street between 1st and 2nd South Streets in Logan, Utah. The north boundary line thereof is 177 feet north of the southwest corner of the intersection of 2nd South and Main Streets and runs east and west for a distance of 231 feet. The west 66 feet of this property runs south to the north side of 2nd South Street. On the east side of this 66 foot strip is a 12 foot right of way covering the east 6 feet thereof and the west 6 feet of the property adjoining it to the east and running north and south from 2nd South Street to the south boundary line of defendant's property on the north. Originally this right of way was 127.5 feet long. While defendant's tract is 99 feet wide on Main Street and the south side thereof at that point is only 78 feet north from 2nd South, at a point 132 feet west of Main Street the boundary line turned to the north 49.5 feet leaving a narrow strip, owned by someone else, that length and 33 feet wide between the east side of defendant's property on the west and the west end of its property on the

east. At that point the property of the predecessor of the defendant was only 49.5 feet wide from north to south. Later defendant's predecessor purchased 37 feet of that strip which is marked "D" on the sketch and left the strip only 12.5 feet long and the right of way only 90.5 feet long. The heirs of plaintiff's testate own the land bounding defendant's property on the north for the full 231 feet. Their property facing Main Street is 214 feet wide and runs to the west in an irregular shaped tract clear through the block to the east side of 1st West Street.

In 1917 and '18 the Utah Idaho Central Railroad was constructed from Ogden to Logan, Utah and on into Idaho. The Logan freight depot of that company was established on the property now owned by the heirs of plaintiff's testate, it also owned most of the property which defendant now owns. At that time the Cache Valley Commission Company which was then doing a commission business in Logan, at the solicitation of the railroad company, was induced to purchase this tract of land from the railroad company at the same price which that company had paid therefore and established its business right next to the freight yards. At the expense of the commission company the railroad company built a spur track along the north side of the property purchased by the commission company from the west out to Main Street. Some distance north from the property line of the property purchased by the commission company and now belonging to the defendant the railroad company constructed its main freight lines running from the west to the west side of Main Street and built its freight house immediately south of those lines with a loading platform on the south side thereof. The Cache Valley Commission Company built its store building immediately south of the spur track on the north side of its property. The following sketch is inserted to aid the reader in visualizing the situation. It is only for illustration purposes and not drawn to scale:

The "Freight House" so marked on the sketch originally extended west from Main Street about 200 or more feet. Projecting therefrom about 9 feet to the south at the front of the freight house was a scale house marked "X" on the sketch for weighing of truck and wagon loads of goods. It was maintained and operated by the M. & L. Coal Company in connection with its coal yards back of the freight house. The part of the freight house which is represented by broken lines as well as the scale house and all of the railroad tracks including the spur line have been removed. The south side

of the loading platform south of the freight house is approximately 26 feet north of the south boundary line of the railroad property. That 26 feet covers a strip of ground directly west of the scale house about 9 feet wide and the strip south of the scale house about 17 feet wide, 16 feet of which is designated "C Disputed Right of Way C" on the sketch. That is the property here in dispute. Immediately south of the boundary line and between it and the north end of the ties on which the spur tracks were laid was an additional strip of ground about 5 feet wide making one continuous open space between the platform and the spur approximately 31 feet wide which narrowed down to about 22 feet wide between the scale house and the spur. All of this ground was graveled and traveled over until it was reduced to a hard surface area with no obstructions thereon to interfer with its use by vehicles and pedestrians.

The north end of the ties on which the spur tracks were laid were about 11 feet from the north side of defendant's building. The ties were about 7 or 8 feet long and the south end of the ties were 3 or 4 feet north of the building. The ground was filled in between the ties and beyond the ends thereof level with the top of the ties but the rails of the spur stood up their entire thickness above the top of the ties and the surface of the surrounding ground. It would be possible for a wagon or truck to drive east and west straddling the rails but it would be difficult for such vehicle to cross the spur traveling north or south because of the difficulty in raising the wheels over the top of the rails, except in two places where planks and gravel had been filled in on each side of and between the rails up to the level of the top thereof. One of these places was at the point marked "A" on the sketch just west of the end of defendant's store building and the other at "B" just east of the east end of defendant's warehouse where the cross markings on the spur are shown. The crossing at "A" was filled in with more planks than at "B" and was used much more.

The old tin building represented by the broken lines between "A" and "B" was removed many years before the

property was sold to the defendant by the commission company in 1942, and prior thereto about 1922, the Warehouse building marked "WHSE" on the sketch was erected. The north and south walls of the warehouse and the store building in front on defendant's property were built in alignment with each other and it was the intention of the commission company from the time the warehouse was built up to the time the property was sold to defendant to join these two buildings together with another section of building between them thus cutting off all possibility of traffic passing from the railroad property across the spur tracks and to the south of defendant's buildings. This plan was never completed.

There was an alleyway on the south side of defendant's buildings which at first was interrupted by the 33 feet by 37 feet tract marked "D" on the sketch. In order to avoid that interruption the commission company many years ago purchased that tract and about that time opened up the alleyway to the south marked "E" on the sketch, so that vehicles entering the alley on the south side of the buildings could get out by turning south and avoid congestion in the alley south of the buildings.

The railroad company from its inception was in financial difficulty and desperately needed more business. A number of times it was sold at forced sale and finally it closed its business, was dismantled and its property sold in 1947 when plaintiff's testate purchased the property here in question. All during the time it was operating it was seeking more business and offering the use of its facilities in its freight yards for that purpose. Several coal companies used the freight yards for storing coal, and as previously shown one coal company maintained and operated a scale house at the entrance of the freight yards. This indicates a policy of the railroad company to invite the use of its facilities rather than to strictly enforce its rights therein.

The commission company, from 1918 to 1942 when it sold its place of business to the defendant, was one of the

largest customers of the railroad company. It handled a large volume of produce which was shipped in and out over the railroad. Some of its produce was loaded and unloaded in carload lots on cars spotted on the spur track, part of such goods were loaded or unloaded directly from the warehouse and store of the commission company and part was delivered from or to trucks or wagons on the north side of the spur track and a part of the disputed right of way was used in such process. Besides there was a large volume of freight shipped in or out over the railroad, not in carload lots, which was delivered to or taken from the freight house by the commission company or by farmers, from whom the goods were purchased or who purchased the same through the commission company, all of which passed from the commission company's property to the railroad yards, or from the railroad yards to the commission company's property or directly to or from the farmers to or from the railroad yards. Also a large volume of goods purchased and stored in the commission company's warehouse and store house, and seed which was cleaned by the commission company for farmers for their own use was weighed on coal company's scales and in the process passed over the disputed right of way. As to all of the above use of the disputed right of way the company's use was as an invitee and not an adverse user.

During all of the time since 1918, when the commission company first established its business next to the railroad property, to some time in 1948, after the railroad had ceased to operate, the defendant's and its predecessors openly, continuously and without interruption used the disputed right of way as a means of ingress and egress to and from its property in addition to its use thereof in connection with railroad and weighing business. During all of that time wagons, trucks and other vehicles and sometimes pedestrians both employees and customers of defendant and its predecessors have entered and left defendant's property over the disputed right of way. Some of them entering defendant's

property over the alleyway south of the buildings thereon and turning to the north across the spur at "A" or "B" and then out over the right of way in dispute, or entering over that right of way and turning south across the spur and then out to the street over one of the alleyways to the south. The volume of this traffic has been substantial, and has only been interrupted when railroad cars have been temporarily spotted on the crossings at "A" and "B" on the sketch, and has been sufficiently notorious to notify the railroad company of its existence.

There is no evidence of any communications either oral or written between the respective owners of the two properties with respect to that usage. No permission for the use thereof has been expressly sought and no right thereto expressly claimed and none has been expressly given or denied. After the property was purchased by plaintiff's testate some time in 1948 defendant was notified to discontinue such usage and a fence erected around the railroad property, whereupon it asserted its claim of right to use such right of way and this action resulted.

The court found that the use of the right of way was open, continuous and uninterrupted and that it was adverse with a claim of right and not permissive and enjoined the plaintiff from interfering therewith. If the evidence is sufficient to sustain the finding that the usage was adverse and with a claim of right on the part of the defendant and its predecessors and was not by permission of the owner then the judgment must be affirmed otherwise it must be reversed.

In *Harkness* v. *Woodmansee,* 7 Utah 227, at page 232, 26 P. 291, 293, we said: ■

"* * * Where a person opens a way for the use of his own premises, and another person uses it also without causing damage, the presumption is, in the absence of evidence to the contrary, that such use by the latter was permissive, and not under a claim of right."

Although, in that case the court held that the user had not continued for the necessary 20 year statutory period,

and, therefore, the quoted holding was not necessary for that decision, this court has repeatedly recognized the doctrine therein announced as the law of this state. *Jensen* v. *Gerrard,* 85 Utah 481, 39 P. 2d 1070; *Zollinger* v. *Frank,* 110 Utah 514, 175 P. 2d 714, 170 A. L. R. 770.

In the *Zollinger* case we affirmed the correctness of that doctrine, but held it not applicable to the facts there because the right of way in that case was used by the owner only infrequently and then he only used a portion of it. The presumption stated in that rule is that in the absence of evidence to the contrary, the trier of fact is required to find that the use was with the permission of the owner and not under claim of right. Here all of the elements required to establish that presumption are present. The railroad company opened up this way on its own premises for its own use in operating its freight yards, the additional use thereof by the defendant and its predecessors did not interfere with that use or damage the owner, and there is not a word of evidence contrary to the premise that this usage was with the permission of the railroad company and not against it under a claim of right or adverse. So under that rule defendant cannot succeed.

There is other evidence which tends to support the above conclusion. During all of the time that such usage continued the defendant or its predecessors were using this disputed right of way as an invitee in shipping its goods over the railroad and in weighing its products on the scales on the railroad property. Such facts tend to show that its use of that right of way which was not connected with the businesses conducted on the railroad property, was also permissive and not adverse.

Plaintiff also produced direct evidence to the effect that the commission company considered the use of that property as a roadway as permissive and not under a claim of right. Mr. Bowen, the president and manager of the commission company during all the time it used this way, testified that he did not consider or claim any such right, and that the

company intended such use to be only temporary because it planned to build a building between the warehouse and the store building of the commission company and thereby join the two buildings together and cut off the possibility of using this right of way in the manner that it was used.

Under such a state of the evidence the finding of the trial court that the use of the right of way in question was under a claim of right and adverse to the railroad and not with its permission, is not supported by the evidence. The judgment is reversed and the case remanded to the district court with directions to enter judgment in accordance with this opinion.

Plaintiff shall recover its costs on this appeal.

PRATT, C. J., and LATIMER, WOLFE and Mc-DONOUGH, JJ., concur.